**PANDUIT CORPORATION,**
**Plaintiff-Appellee,**

v.

**BURNDY CORPORATION and Burndy Midwest, Inc., Defendants-Appellants.**

**No. 73–1989.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 16, 1974.

Decided May 30, 1975.

Rehearing Denied July 9, 1975.

Gregory B. Beggs, Chicago, Ill., John M. Calimafde, New York City, for defendants-appellants.

David A. Vogel, Chicago, Ill., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, and CUMMINGS and PELL, Circuit Judges.

PELL, Circuit Judge.

The plaintiff Panduit Corporation (Panduit) brought this action, charging the defendants Burndy Corporation and Burndy Midwest, Inc. (collectively, Burndy) with infringement of Panduit Reissue Patent No. 26,492. The district court found the plaintiff's patent valid and infringed and the defendants appeal.

*Background*

The patent in suit relates to a hand-held plier-type binder strap tool for tensioning plastic self-locking binder straps around bundles to a predetermined tension and automatically cutting off the free end of the strap when the predetermined tension is reached. The bundles which are bound by such straps typically are groups of insulated electrical wires.

Prior to 1958, string, cord, and wire were used as binding elements. Since these binding elements were not self-

locking, the binder tools at that time required mechanisms for twisting, crimping, or otherwise securing the ends of the binding elements. There were essentially two types of binder tools disclosed by prior patents: (1) tools having an automatic cutoff mechanism; and (2) plier-type tools.

In the tools having an automatic cutoff mechanism, a gripper pulled the free end of the binding material to tension the strap around the bundle. Tension in the strap was sensed by a biasing mechanism in which a spring was balanced against the tension in the strap. When the strap tension reached a predetermined tension and exceeded the spring force, crimping automatically began, followed by an automatic severing of the free end of the strap. Such a biasing mechanism and automatic cutoff were found in the Harvey 1,789,900 Patent (Harvey '900), the Harvey 1,989,699 Patent (Harvey '669), and the Gerrard 1,669,048 Patent (Gerrard '048). Since these tools included crimping mechanisms, they were large tools and not handheld, although they were hand-operated.

The plier-type binder tools all had jaws and handles pivoted together, cutters, and some means for operating the cutter when required. Due to their small size, these tools could not contain automatic crimping devices; rather, the operator of the plier-type tool typically, upon sensing the correct tension, rotated the tool, thereby twisting the wire, and then manually operated the cutter to sever the ends of the wire.

In 1958, Thomas & Betts Company (Thomas & Betts) introduced a plastic self-locking strap for bundling wires into cables.[1] The self-locking strap is a flat, beltlike piece of plastic having a serrated side and a buckle at one end that permits the strap to be pulled through in one direction only. In using the self-locking strap, the operator manually places the strap around the bundle and feeds the end of the strap through the buckle. The strap is tightened either by hand or by use of a tool. When the strap is tightened, the tail of the strap may be left on or cut off as desired. The self-locking aspect of these straps eliminates the need for twisting or crimping the strap.

At the time it introduced the plastic self-locking strap, Thomas & Betts also introduced a patented plier-type hand tool (the Logan tool) for facilitating the installation of the straps. In using this tool, the operator looped the self-locking strap around the bundle and inserted the end of the strap through the buckle. The free end of the strap was then fed into the tool and the operator tightened the strap by squeezing the handles. The free end of the strap was cut off by manual operation of a cutter when the operator sensed the proper tension in the strap around the bundle.

From 1958 to 1962, Thomas & Betts was the principal manufacturer of plier-type binder tools for use in applying the plastic self-locking straps. In March 1962, Panduit introduced the patented plier-like tool which was designed to work with the plastic straps. As with the Logan tool, the operator of the patented tool places the strap around the bundle and pulls the strap end through the buckle. The free end of the strap is then fed through a slot in the first jaw of the tool and secured in a gripper in the second jaw. The operator squeezes the handles of the tool, thereby forcing the jaws apart and tightening the plastic strap around the bundle. Unlike the Logan tool, however, the patented tool contains a spring-controlled cutoff mechanism that operates automatically to sever the free end of the binder strap only when a predetermined tension is achieved in the strap around the bundle. That is, when the tension in the strap exceeds the tension in the spring of the tool, the severing mechanism is actuated, causing a blade to sever the free end of the plastic strap next to the buckle. The patented tool also contains an adjust-

---

1. Thomas & Betts is not a party to this suit.

ment mechanism so that the tension at which the binder strap is drawn can be changed to accommodate different sizes of binder straps and different sizes and types of bundles.

The patent in suit is a reissue patent of original Patent No. 3,169,560, filed March 8, 1962. During the prosecution of the original patent, the Examiner did not cite a single patent directed to a plier-type binder tool or a single patent disclosing a biasing mechanism for automatic cutoff. The original patent was issued in February 1965. In 1966, when considering litigation under the original patent, Panduit caused a validity search to be conducted. The Harvey '669 patent was found in this search. As a result of this search, a reissue application, citing the Harvey '669, was filed in order to add, amend, and narrow certain claims to distinguish the Harvey '669. The Patent Examiner at first rejected the claims in the reissue application as unpatentable over the Harvey '669 but eventually the reissue patent was granted.

In late 1967 and early 1968, Burndy developed a "pistol-grip" tool for tensioning plastic self-locking straps. Like the Panduit tool, the Burndy tool contains an automatic cutoff mechanism to sever the strap when a predetermined tension is achieved.

Panduit charges that the defendants' tool infringes on claims 1 through 5 and 14 through 16 of the reissue patent. Essentially, these claims describe a plier-type tool having two jaw members and performing the following four functions: (1) applying a pulling force to the free end of the binder strap to tension the strap; (2) sensing the tension in the binder strap; (3) actuating cutoff when the predetermined tension is sensed; and (4) applying the necessary force to achieve severance. All of these functions are performed in automatic sequence with no operator decision.

*Obviousness*

 Burndy contends that the Panduit patent is invalid for obviousness.[2] Under 35 U.S.C. § 103, an invention is not patentable, even though it is not identically disclosed by the prior art, if

"the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

In Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966), the Supreme Court suggested the following approach for determining whether an invention is obvious:

"[T]he scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined."

 In the present case, there was no prior art containing both a bias mechanism and a plier-type tool. The district court, as well as Panduit, placed much emphasis on this fact. Under § 103, however, a claimed invention may be obvious, even though it is not identically disclosed or described by the prior art; it

2. A patent is, of course, presumed valid, 35 U.S.C. § 282, and this presumption applies to reissue patents with the same force as it applies to original patents, 35 U.S.C. § 252.

Burndy contends that this presumption of validity is weakened here because, during the prosecution of the reissue patent, the Patent Examiner did not cite the Harvey '900, which Burndy asserts is the most pertinent prior art.

The Harvey '900 patent was, however, classified within a class searched by the Examiner. In this situation, it is presumed that the Examiner considered the art and discarded it as being no more pertinent than that cited by him. Uarco Inc. v. Moore Business Forms, Inc., 440 F.2d 580, 585 (7th Cir. 1971), cert. denied, 404 U.S. 873, 92 S.Ct. 91, 30 L.Ed.2d 117; Canaan Prod., Inc. v. Edward Don & Co., 388 F.2d 540, 544 (7th Cir. 1968).

is sufficient that the subject matter of the patented article, taken as a whole, has been disclosed by the prior art. "[O]bviousness does not require that the combination of prior art references precisely duplicate the patented article." Toro Mfg. Corp. v. Jacobsen Mfg. Co., 357 F.2d 901, 903 (7th Cir. 1966); Akron Brass Co. v. Elkhart Brass Mfg. Co., Inc., 353 F.2d 704, 706 (7th Cir. 1965).

Here, the prior art disclosed both plier-type tools for applying plastic self-locking straps and biasing mechanisms for automatic severance. Panduit's improvement over the prior art consisted of incorporating into the plier-type tool a biasing mechanism so that the self-locking strap would be automatically cut off when a predetermined tension in the strap was reached.

■ The mere fact that a patent consists of a combination of old elements does not, of course, render it invalid. However, as this court has recently noted, a claimed invention consisting of old elements must pass a "rather severe test." Skil Corp. v. Lucerne Prod., Inc., 503 F.2d 745, 749 (7th Cir. 1974). See also Toro Mfg. Corp., *supra* at 904. The court must determine, with regard to a combination patent, whether the combination was reasonably obvious to one with ordinary skill in the art and whether the invention produced a "new or different function." Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc., 396 U.S. 57, 60, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969). "The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention." A & P Tea Co. v. Supermarket Equip. Corp., 340 U.S. 147, 151, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950); Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 82 L.Ed. 1008 (1938).

■ From our review of the record, we are convinced that the Panduit patented tool, viewed as a whole, was obvious in light of the Harvey patents and the prior plier-type tools.[3] No "new or different" function was produced by the combination of the two known elements. The plier portion of the patented tool performs exactly as it did in the earlier plier-type tools. The biasing mechanism in the Panduit tool, although not identical to prior biasing mechanisms, performed essentially the same function as those in the Harvey patents, i. e., it automatically set a process into operation when a predetermined tension was reached by balancing the spring tension against the tension in the strap. The Harvey patents differed from the Panduit tool, in this respect, only in the fact that they provided for crimping prior to the severance.[4] Plaintiff's own expert conceded that the design of a biasing mechanism was within the skill of the art. Moreover, recognizing the desirability of having an automatic cutoff mechanism in a plier-type tool, after the intro-

---

3. Burndy challenges the fact that the district court substantially adopted the findings and conclusions submitted by Panduit. Although we think it not the best practice, we disagree with the contention. As this court has noted, although the adoption of large portions of one party's proposed findings and conclusions "has been criticized, United States v. El Paso Natural Gas Co., 376 U.S. 651, 656–57 n.4, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964), such practice is certainly within the trial court's discretion . . . ." Reese v. Elkhart Welding & Boiler Works, Inc., 447 F.2d 517, 520 (7th Cir. 1971).

4. The Harvey '900 patent provided, *inter alia:*
 "The general object of this invention is to provide simple mechanism for developing a predetermined amount of tension and operating to arrest the stretching at this point. Also to provide means which will operate automatically to sever the strap beyond the tie after the tie is formed."
The Harvey '699 patent provided, *inter alia:*
 "A further object is to provide means for tensioning the band to a predetermined tension.
 "A further object is to provide means which will operate when the band has been tensioned to a predetermined degree for interrupting further tensioning, and which means may be utilized to automatically inaugurate the tying and severing operations."

duction of the self-locking strap, was not an inventive act; the vice-president of Panduit and co-inventor of the patented tool admitted that such a combination was obvious.

Panduit makes much of the fact that, in the Harvey patents,[5] when the predetermined tension in the strap around the bundle was reached, the crimping began. Only after the crimping was over was there an automatic severance. Although the crimping mechanism was responsive to a predetermined tension being reached in the strap around the bundle, the actual automatic cutoff, according to Panduit, was responsive only to a tension between the crimping and the point of cutting and not to the tension of the strap around the bundle. We find Panduit's argument unpersuasive. The important point is that the Harvey patents disclosed bias mechanisms which, upon sensing a predetermined tension in the strap around the bundle, automatically and without operator decision, set a process into operation. Because the self-locking strap had not yet been invented at the time of the Harvey patents, crimping was necessarily a part of this process. In the self-locking strap, the buckle performs the function of crimping, rendering the crimping device obsolete and unnecessary.

In essence, Panduit merely eliminated the part of the Harvey patents which had become obsolete due to advances in the binding-strap industry. The Panduit tool, in fact, could not work except for and with the self-locking strap. As explained above, Panduit's own expert admitted that making a tension-responsive mechanism was obvious and within the skill of the art prior to the introduction of the Panduit tool. The elimination of

the complicated crimping device simply enabled Panduit to compact the mechanism into a hand-held tool. As the Supreme Court has stated, "[I]f the omission of an element is attended by a corresponding omission of the function performed by that element, there is no invention if the elements retained perform the same function as before." Richards v. Chase Elevator Co., 159 U.S. 477, 486, 16 S.Ct. 53, 54, 40 L.Ed. 225 (1895). The First Circuit has similarly noted, "to achieve small size, light weight, simplicity and lower cost by the simple expedient of omitting a function of an earlier machine because some change in technology has made the function no longer necessary would at least in the absence of very exceptional circumstances, be only a mechanic's expedient." Shu-Conditioner, Inc. v. Bixby Box Toe Co., 294 F.2d 819 (1st Cir. 1961).

Panduit's reliance on Uarco Inc. v. Moore Business Forms, Inc., 440 F.2d 580 (7th Cir. 1971), cert. denied, 404 U.S. 873, 92 S.Ct. 91, 30 L.Ed.2d 117; and Ortman v. Maass, 391 F.2d 677 (7th Cir. 1968), is inapposite. In Uarco the unique feature of the patented invention was not found in the prior art, nor did the prior art suggest the combination. Moreover, in Uarco, portions, which were not necessarily obsolete, of the two most pertinent references would have had to be discarded to produce a result similar to the patented invention. In Ortman, to achieve the combination disclosed in the patent in question "would have required the artisan to discard the principal elements" in the prior art. 391 F.2d at 682. As in Uarco, the discarded portions in Ortman were not found to be obsolete. In the present case, the only item which had to be discarded from the Harvey patents was the crimper, which had been ren-

---

5. The Harvey '900 patent, which preceded in time the Harvey '669 patent, is in the nature of a concept while the Harvey '669 modifies and describes one figure in the Harvey '900. The parties disagree on which Harvey patent is the most pertinent prior art: Panduit contends it is the Harvey '669, while Burndy argues that it is the Harvey '900. In addition, Panduit con-

tends that the Harvey '900 patent is inoperative prior art. We need not resolve these disputes. We find that, even assuming arguendo the Harvey '669 is the most pertinent prior art, the Panduit patent is invalid for obviousness, despite the fact that the Panduit claims had been narrowed somewhat in the reissue patent.

dered obsolete by the introduction of the self-locking strap. Moreover, the incorporation of the automatic cutoff mechanism into a plier-type tool did not require discarding anything from the prior plier tools.

■ Finally, Panduit argues that its tool filled a long-felt need in the industry and has been a commercial success. While such secondary considerations may be "indicia of obviousness or nonobviousness," *John Deere, supra,* 383 U.S. at 18, 86 S.Ct. 684, "those matters 'without invention will not make patentability.'" *Black Rock, supra,* 396 U.S. at 61, 90 S.Ct. at 308; *A & P Tea Co., supra,* 340 U.S. at 153, 71 S.Ct. 127. On the record before us, these factors do not tip the scales in favor of patentability. See *Higley v. Brenner,* 128 U.S.App.D.C. 290, 387 F.2d 855, 859 (1967); *Novo Indus. Corp. v. Standard Screw Co.,* 374 F.2d 824, 828 (7th Cir. 1967), cert. denied, 389 U.S. 823, 88 S.Ct. 51, 19 L.Ed.2d 75; *T. P. Laboratories, Inc. v. Huge,* 371 F.2d 231, 236 (7th Cir. 1966).

In view of our decision that the Panduit patent, taken as a whole, is invalid for obviousness, we deem it unnecessary to consider the issue of infringement.

Accordingly, the judgment of the district court is reversed and the matter is remanded with directions that the plaintiff's complaint be dismissed.

Reversed and remanded.

## ON PETITION FOR REHEARING

■ In support of its petition for rehearing, Panduit Corporation contends, *inter alia,* that this court in its opinion filed May 30, 1975, improperly invalidated its entire patent in issue. The only issues before the district court concerned the validity and infringement of Claims 1 through 5 and 14 through 16. Those issues were the only ones before this court. The opinion and judgment of this court are no broader than the claims which were placed in issue by the parties, irrespective of the impact that this court's opinion may have on other claims not put in issue. To the extent that the scope of the holding of this court was not entirely clear from the opinion filed May 30, 1975, the opinion and judgment of this court are expressly confined to Claims 1 through 5 and 14 through 16, and as to those claims the patent is invalid.

We find no merit in the other contentions raised by the petition for rehearing and no judge in active service having requested a vote, the petition for rehearing is denied.